UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| SALLY A. JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 2:18-CV-10 PLC |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Deputy Commissioner of Operations, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM AND ORDER**

Plaintiff Sally Jones seeks review of the decision of the Social Security Administration (SSA) denying her applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.[1] The Court has reviewed the parties' briefs and the administrative record, including the hearing transcript and medical evidence. For the reasons set forth below, the case is reversed and remanded.

### I. *Background and Procedural History*

Plaintiff, who was then forty-five years old, filed applications for Disability Insurance Benefits and Supplemental Security Income in June 2015, alleging she was disabled as of March 15, 2007.[2] (Tr. 15) The SSA denied Plaintiff's applications, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 133, 145-46)

The SSA granted Plaintiff's request for review, and an ALJ conducted a hearing in January 2016. (Tr. 161) In a decision dated June 25, 2017, the ALJ determined that Plaintiff "has not

---

[1] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). [ECF No. 9]
[2] Plaintiff later amended her date of onset to June 26, 2015. (Tr. 87)

1

been under a disability, as defined in the Social Security Act from March 15, 2007, through the date of this decision[.] (Tr. 25).

In her decision, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920 and determined that Plaintiff had the severe impairments of: "degenerative disc disease with mild spondylosis that is slightly eccentric with the right greater than the left at L4-L5 and L5-S1, obesity, chronic obstructive pulmonary disease (COPD), and major depressive disorder." (Tr. 17) Additionally, the ALJ found that Plaintiff had the non-severe impairments of diabetes mellitus, gastro esophageal reflux disease (GERD), and hypertension. (Tr. 18)

After reviewing the record, the ALJ determined that Plaintiff had the residual functioning capacity (RFC) to:

> Perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she can never climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs; and she can occasionally stoop, kneel, crouch and crawl. She must avoid concentrated exposure to excessive vibration, pulmonary irritants such as fumes, odors, dust and gases, extreme cold, extreme heat, moving factory-type machinery and unprotected heights. She can perform work limited to simple repetitive tasks. She can have occasional contact with the public, co-workers and supervisors.

(Tr. 20) Finally, the ALJ concluded: "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 24)

Plaintiff requested review of the ALJ's decision with the SSA Appeals Council, which denied review in January 2018. (Tr. 1) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

With respect to the medical records and other evidence of record, the Court adopts

Plaintiff's recitation of facts set forth in her Statement of Material Facts [ECF No. 22-1], to the extent admitted by Defendant [ECF No. 28-1]. The Court also adopts the additional facts set forth in Defendant's Statement of Additional Facts [ECF No. 28-2] and notes that Plaintiff did not refute them. Together, these statements provide a fair and accurate description of the relevant record before the Court. The Court will address specific facts related to the issues raised by Plaintiff as needed in the discussion below.

## II.  *Standards for Determining Disability Under the Act*

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920. Those steps require a claimant to show that he or she:  (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

## III. Discussion

Plaintiff claims substantial evidence does not support the ALJ's decision because the ALJ failed to: (1) properly evaluate and provide "good reasons" for discrediting the opinion of Plaintiff's treating physician; and (2) find that Plaintiff's borderline intellectual functioning was a severe impairment. [ECF No. 22] Defendant counters that: (1) substantial evidence supported the ALJ's evaluation of Plaintiff's subjective complaints, including her evaluation of the medical opinion evidence; and (2) the failure to find Plaintiff's borderline intellectual functioning was a severe impairment did not constitute reversible error.

### A. Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

### B. Treating physician

Plaintiff contends the ALJ's RFC determination is not supported by substantial evidence because the ALJ improperly discredited the medical opinion of Plaintiff's primary care

4

physician, Dr. Heather Gessling. [ECF No. 22] More specifically, Plaintiff argues that the ALJ did not provide "good reasons" for discrediting Dr. Gessling's medical source statement (MSS) because the ALJ cited only one treatment note and appeared to disregard the treatment notes of Plaintiff's pain management physician, Dr. Miranda Reed. In response, Defendant asserts that the ALJ properly cited Dr. Gessling's most recent treatment note and discussed other evidence in the record that conflicted with Dr. Gessling's MSS.

"A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."[3] Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008) (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Id. (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)). See also Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000).

"Whether the ALJ gives the opinion of a treating physician great or little weight, the ALJ must give good reasons for doing so." Walker v. Comm'r, 911 F.3d 551, 553 (8th Cir. 2018) (quoting Reece v. Colvin, 834 F.3d 904, 909 (8th Cir. 2016)). "This requires the ALJ to explain in his written decision, with some specificity, why he has rejected the treating physician's opinion." Id. (citing Singh, 222 F.3d at 452)). "Failure to do so is reversible error." Id.

In early June 2015, Plaintiff presented to Dr. Gessling complaining of shortness of breath and "back pain and pain down her legs and she feels like she cannot walk long distances." (Tr.

---

[3] Under current regulations, a treating physician's opinion is entitled to no special deference. See 20 C.F.R. § 404.1520c. These regulations were effective as of March 27, 2017. See 20 C.F.R. § 404.1527. Because Plaintiff filed her claims in June 2015, the old regulations apply. See Walker v. Comm'r, 911F.3d 551, 553 n.1 (8th Cir. 2018)

345-47) At the time, Plaintiff was taking, among other medications, cyclobenzaprine. (Tr. 346) Upon examination, Dr. Gessling noted that Plaintiff displayed normal gait, station, breath sounds, and musculoskeletal tone and strength. (Tr. 347) Dr. Gessling ordered chest x-rays and an MRI. (Tr. 349) The MRI revealed: "Mild spondylosis, slightly eccentric right greater than left L4-L5, L5-S1, most prominent at L5-S1 level…No gross spinal stenosis." (Id.) Dr. Gessling noted that Plaintiff "had a pretty good chest x-ray," which revealed "no acute processes...in the chest." (Tr. 346, 367)

In late June 2015, Plaintiff returned to Dr. Gessling complaining of difficulty breathing when lying down or doing "any activity," as well as pain in her buttocks and legs. (Tr. 352) Dr. Gessling observed normal ambulation and normal breath sounds with no dyspnea, wheezing, rales/crackles, or rhonchi. (Id.) Dr. Gessling provided Plaintiff a sample of Advair 250/50 for her COPD and began Plaintiff on two liters of oxygen at night. (Tr. 353)

In July 2015, Plaintiff underwent an epidural steroid injection ordered by Dr. Gessling. (Tr. 361, 478) At her follow-up appointment with Dr. Gessling, Plaintiff reported experiencing "some very bad spasms yesterday." (Tr. 478) Plaintiff also informed Dr. Gessling that "she has had to use her oxygen at home sometimes during the day." (Id.) Dr. Gessling noted that Plaintiff "is wheezy today and always short of breath when she talks to people" and that Plaintiff was still smoking. (Tr. 479-80) Later that month, Plaintiff reported "no worsening of her back pain" and "improvement in her breathing since being on the Advair 500/50." (Tr. 474) Dr. Gessling noted no dyspnea, normal gait and station, and normal muscle strength and tone. (Tr. 475)

Plaintiff followed up with Dr. Gessling in September 2015 after a visit to the emergency room for back pain that was radiating down her legs. (Tr. 471) The emergency room doctor had

6

diagnosed Plaintiff with a urinary tract infection and esophagitis. (Tr. 471) Dr. Gessling noted that Plaintiff's "[a]cute back pain is essentially resolved." (Tr. 468) When Plaintiff returned to Dr. Gessling's office later that month, she reported "[h]er back pain is doing fine." (Tr. 466)

In October 2015, Plaintiff reported that she was "having back pain again," and Dr. Gessling referred her to a pain management specialist. (Tr. 459-62). Dr. Gessling noted that Plaintiff had no dyspnea and her ambulation, gait, and station were normal. (Tr. 462)

At a follow-up appointment with Dr. Gessling in December 2015, Plaintiff informed Dr. Gessling that "she has been coughing for a while" and "[s]he has not been having any shortness of breath but she feels like she is choking or having reflux." (Tr. 453-54) When Plaintiff followed up with Dr. Gessling later that month, Dr. Gessling diagnosed Plaintiff with acute exacerbation of COPD and pneumonia. (Tr. 450)

In late December 2015, Plaintiff saw Susan Rasmussen, a nurse practitioner ("NP") in Dr. Gessling's office. (Tr. 443) Plaintiff continued to have a cough and sore throat, and NP Rasmussen observed mild dyspnea, "decreased breath sounds, diminished air movement, and expiratory wheezing[.]" (Tr. 446)

Plaintiff presented to the emergency room with shortness of breath after an upper endoscopy on January 6, 2016. (Tr. 375) The emergency room physician diagnosed Plaintiff with "acute exacerbation of chronic obstructive airways disease" and admitted her overnight. (Tr. 371) The doctor noted that Plaintiff's oxygen saturation levels without oxygen assistance were low, but Plaintiff "turned around rather quickly and was feeling better, ambulating about in her room" on low oxygen. (Id.) A chest x-ray showed that Plaintiff's lungs were clear, and the doctor discharged Plaintiff the following day with instructions to finish the prescribed antibiotic and steroid, continue oxygen "at all times until followed by PCP and weaned off," and "stop

7

smoking." (Tr. 371-72, 380)

Plaintiff followed up with NP Rasmussen the following week. (Tr. 434) Plaintiff reported chest pain on exertion, shortness of breath when walking, and ankle edema. (Tr. 437) NP Rasmussen observed no dyspnea, no wheezing, normal breath sounds, good air movement, and "slight pitting edema, bilateral." (Tr. 438) An EKG was normal.[4] (Id.)

Plaintiff returned to Dr. Gessling's office in March 2016, with a continued cough, "lots of swelling," and "some shortness of breath but not as bad as it has been." (Tr. 429) Plaintiff was taking, among other medications, cyclobenzaprine and gabapentin. (Tr. 428) Dr. Gessling observed that Plaintiff ambulated normally, had normal breath sound and good movement of air, and and exhibited no dyspnea, wheezing, rales/crackles, or rhonchi. (Tr. 429) Dr. Gessling prescribed Plaintiff a CPAP machine. (Id.) When Plaintiff followed up with Dr. Gessling later that month, she was "having some sinus issues" but the acute bronchitis "improved," as was her sleeping. (Id.) Plaintiff reported that she was trying to quit smoking. (Id.)

In late March 2016, Dr. Miranda Reed, a pain management specialist, diagnosed Plaintiff with lumbar spondylosis, bilateral sacroiliac joint disorder, and degeneration of lumbar intervertebral disc. (Tr. 545) Dr. Reed performed "lumbar medial branch block x 3 and peripheral nerve block x 1 bilaterally with fluoroscopy." (Id.) After the procedure, Plaintiff reported "at least 40% more relief." (Id.)

When Plaintiff followed up with Dr. Reed the next month, she reported a cough, wheezing, shortness of breath, muscle aches, arthralgias/joint pain, back pain, and difficulty walking. (Tr 543) Upon examination, Dr. Reed observed tenderness of the "spinous process at

---

[4] In January and February 2015, Plaintiff had several appointments with a cardiologist who determined that Plaintiff's COPD was "probably the cause of her disability of chest pain and shortness of breath." (Tr. 412-16, 421) In February 2015, Plaintiff underwent a polysomnography and was diagnosed with "moderately severe sleep apnea." (Tr. 407)

L (L4-S1), the transverse process on the right and left at L (L4-S1)" and tenderness of the "PSIS and SI joint of the right and left hip, tenderness of the paraspinal region at L (L4-S1) on the right and left, limited lateral flexion and rotation to the left and right." (Id.) Dr. Reed also noted a positive Patrick-Fabere test and a positive supine straight leg raising test. (Tr. 543) Dr. Reed prescribed Norco and Flexeril, continued Plaintiff's trazodone and gabapentin, and decided to "hold on injections on future LMBB since patient did not receive adequate relief from previous LMBB – no RFA candidate at this time." (Tr. 544)

At her appointment with Dr. Gessling in May 2016, Plaintiff reported suffering a seizure the week before. (Tr. 574) Dr. Gessling noted that Plaintiff's gait and station were normal and she had no dyspnea, and she referred Plaintiff to a neurologist for follow-up on the seizure. (Id.) When Plaintiff saw Dr. Reed the same month, she reported that her quality of life since receiving pain management was "better" but her daily level of function had not increased and she recently fell out of a chair. (Tr. 539) She continued to experience muscle aches, muscle weakness, muscle cramps, arthralgias/joint pain, and back pain. (Id.)

Plaintiff followed up with Dr. Reed about her back pain in June 2016. (Tr. 531) Plaintiff rated her pain as an eight on a ten-point scale, and she underwent bilateral sacroiliac joint injections. (Tr. 534-35) After the procedure, Plaintiff reported "more than 80% relief," her "Fabere sign was minimally positive," and "[o]verall, the patient was pleased with the results." (Tr. 535)

Plaintiff followed up Dr. Gessling later that month. (Tr. 570) Dr. Gessling renewed Plaintiff's oxygen for use at night, noted that the increased hydrochlorothiazide (HCTZ) "has helped her swelling," and stated that Plaintiff's "acute back pain is essentially resolved." (Id.)

In late-June 2016, Plaintiff returned to Dr. Reed for treatment of her lower back pain.

(Tr. 527) Plaintiff reported that her back pain was radiating into her buttocks and was worsening, rating it at nine out of ten. (Tr. 529) Plaintiff also complained of pain in her left knee. (Id.) Dr. Reed administered bilateral sacroiliac joint injections with fluoroscopy, after which Plaintiff "reported more than 60% relief." (Tr. 530-31)

When Plaintiff followed up with Dr. Reed in July 2016, she reported "2 days of relief after last injection" and stated "she is still in increased pain." (Tr. 524) Dr. Reed opined that the injections were not improving Plaintiff's condition, and therefore recommended Plaintiff "focus on a healthier lifestyle of weight loss and exercise." (Tr. 525) Dr. Reed also increased Plaintiff's gabapentin. (Id.) Dr. Reed noted that Plaintiff's daily level of function had not improved but she was "fully ambulatory" and able to feed, dress, and bathe herself and get out of bed or up from a chair without assistance. (Tr. 526)

At an appointment with Dr. Gessling in July 2016, Plaintiff complained of dysuria and a "continued sinus infection," and Dr. Gessling noted that Plaintiff "is smoking and she is around cats." (Tr. 565) Plaintiff's physical exam revealed no dyspnea and normal gait, station, and ambulation. (Tr. 566)

Plaintiff returned to Dr. Reed's office in early-August 2016. (Tr. 518) Plaintiff reported that her back pain was improving, rating it seven out of ten, her quality of life had improved, and the "increase in gabapentin is working." (Tr. 520) Dr. Reed again increased Plaintiff's gabapentin and encouraged Plaintiff to continue her at-home physical therapy, stop smoking, and lose weight. (Tr. 522) When Plaintiff followed up with Dr. Reed one month later, she reported continued improvement in her pain, rating it five out of ten, and "no issues with medications." (Tr. 516) Plaintiff's daily level of function had increased, she was trying to smoke less, and she had "lost some weight." (Id.)

In September 2016, Dr. Gessling noted that Plaintiff "has had return of her swelling and she is not happy about it." (Tr. 561) Dr. Gessling observed that Plaintiff had no dyspnea and normal and gait and station, and she increased Plaintiff's HCTZ. (Tr. 562) Plaintiff returned to Dr. Gessling's office one week later complaining of coughing, pain in her right hip, leg pain with swelling, cramps, and muscle aches. (Tr. 556-57) Dr. Gessling provided Plaintiff a sample of Advair, decreased Plaintiff's HCTZ, and prescribed Lasix. (Tr. 558)

Plaintiff followed up with Dr. Reed in late-September 2016, and reported pain radiating to the bilateral buttocks and bilateral calve pain. (Tr. 512) She rated her pain seven out of ten. (Tr. 512) Dr. Reed recommended normal activity and continued Plaintiff's pain medications. (Tr. 513)

Plaintiff's last recorded appointment with Dr. Gessling was October 2016. (Tr. 549) Plaintiff informed Dr. Gessling that she had been suffering "cold symptoms off and on since Sept 7th" and was "still feeling bad." (Tr. 552) Although her "swelling had been pretty good," she was experiencing "pain in her feet that she feels like is her neuropathy pain." (Id.) Plaintiff had normal gait and station, breath sounds, and ambulation and no dyspnea. (Id.)

Later that month, Plaintiff returned to Dr. Reed complaining of pain radiating to the bilateral buttocks and bilateral calve pain. (Tr. 507) Plaintiff rated her pain six out of ten. (Id.) Dr. Reed noted Plaintiff to have tenderness in the lumbar spine and limited range of motion, decreased sensation of the knee and medial left leg, but normal gait and ambulation. (Tr. 508) Dr. Reed continued Plaintiff's pain medications and recommended Plaintiff "continue to remain active" and "work on stopping smoking." (Id.)

In December 2016, Dr. Reed answered interrogatory questions regarding Plaintiff's condition. (Tr. 587-88) Dr. Reed listed the following diagnoses: lumbar spondylosis, sacroiliac

disorder, degeneration of lumbar intervertebral disc, lumbosacral radiculopathy, lumbar spasms, tobacco dependence syndrome, and obesity. (Tr. 588) Dr. Reed opined that these conditions "indeed cause [Plaintiff] to suffer from pain." (Id.) Dr. Reed further stated: "Position changes can be helpful to [Plaintiff], however, in my medical opinion, I discourage her from being inactive. She will also benefit from weight loss and tobacco cessation. I highly encourage physical therapy." (Id.)

Dr. Gessling completed a MSS for Plaintiff in early January 2017. (Tr. 591- 93) Dr. Gessling opined that Plaintiff could: frequently lift and/or carry five pounds; occasionally lift and/or carry ten pounds; stand and/or walk a total of one hour or continuously for five minutes; sit a total of one hour or continuously for ten minutes; and push or pull no more than twenty pounds for less than one minute. (Tr. 591) Additionally Plaintiff could: occasionally reach, handle, finger, and feel; and less than occasionally climb, balance, stoop, kneel or crouch. (Tr. 592) Plaintiff's environmental restrictions included "dust, fumes, humidity, [and] temperature extremes due to COPD." (Id.) Dr. Gessling based these assessments on Plaintiff's lower back, legs, and feet and an MRI of her lumbar spine dated June 17, 2015. (Tr. 593) Finally, Dr. Gessling opined that, "to help [Plaintiff] in regard to control of existing pain or fatigue," Plaintiff would need to: assume a reclining position for up to thirty minutes, one to three times per day; assume a supine position for up to thirty minutes, one to three times per day, and prop up her legs while sitting, one to three times per day. (Id.)

In her decision, the ALJ determined that Plaintiff had the RFC to perform sedentary work with various postural and environmental limitations. In reaching this decision, the ALJ observed that Plaintiff "was smoking and still had a good chest x-ray," she indicated that her inhaler helped, and in October 2016, Plaintiff displayed normal breath sounds with good air

12

movement and no wheezing, rales or crackles, or rhonchi. (Tr. 21) In regard to Plaintiff's back pain, the ALJ referred only to an x-ray of Plaintiff's lower back, which "showed mild spondylosis, slightly eccentric right greater than the left at L4-L5 and L5-S1 that is most prominent at the L5-S1 level," and "a treatment record from October 2016 [that] noted that [Plaintiff's] gait and station were normal." (Id.) Significantly, the ALJ's decision did not discuss Dr. Reed's treatment notes or answers to interrogatories.

The ALJ acknowledged Dr. Gessling's opinion that Plaintiff "should be limited to less than sedentary exertional work," but assigned the opinion "little weight" because it "was inconsistent with her own treatment record and the record as a whole." (Tr. 22) The ALJ explained: "[H]er treatment record from October 2016 noted that the claimant had no dyspnea and no wheezing, rales or crackles, or rhonchi and that her breath sounds were normal with good air movement; and that she had a normal station and gait." (Id.) The record contained no other doctor-completed physical RFC assessments.

Under the framework provided by the regulations, Dr. Gessling's opinion was entitled to controlling weight. When Dr. Gessling completed Plaintiff's MSS, she had been seeing Plaintiff every four to eight weeks for at least eighteen months. See 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). As Plaintiff's primary care physician, Dr. Gessling was in the position to provide a longitudinal perspective on Plaintiff's impairments, which included degenerative disc disease and COPD, and Dr. Gessling based her opinion on Plaintiff's combination of impairments.

The ALJ discredited Dr. Gessling's opinion because it was "inconsistent with her own

13

treatment record and the record as a whole." However, the only example the ALJ cited was Dr. Gessling's October 2016 observations about Plaintiff's breathing, gait, and station, and the ALJ did not discuss how Dr. Reed's treatment notes factored into her decision.

The record is replete with evidence that substantiates Dr. Gessling's opinion.[5] Dr. Gessling's treatment notes reflect that Plaintiff consistently complained of pain in her back, buttocks, and legs. Dr. Gessling referred Plaintiff to Dr. Reed for pain management, and Plaintiff saw Dr. Reed ten times between March and October 2016. Dr. Reed's notes revealed that Plaintiff's back pain persisted at moderate to severe levels. Dr. Reed administered various injections, which provided Plaintiff only temporary relief, and she prescribed narcotic pain medications.

Furthermore, Dr. Gessling based her opinion on objective medical evidence, specifically an MRI of June 2015. Given the extensive records relating to Plaintiff's degenerative disc disease, Dr. Gessling's October 2016 observation of Plaintiff's gait and station was an insufficient basis upon which to disregard Dr. Gessling's MSS. See, e.g., Dunham v. Astrue, Case No. 1:12-CV-21 SNLJ, 2013 WL 384483, at *18 (E.D. Mo. Jan. 11, 2013) ("[T]he fact that plaintiff's gait and balance may have been normal on some examinations is not inconsistent with the opinion that plaintiff was limited in his ability to work eight hours a day due to his combination of chronic mechanical cervical back pain, degenerative arthritis, chronic bilateral shoulder and knee pain, chronic bilateral foot pain, chronic low back pain, bilateral carpal tunnel syndrome, hypertension, diabetes mellitus, sleep apnea, depression, and

---

[5] Plaintiff's testimony at the administrative hearing was consistent with Dr. Gessling's medical opinion. (Tr. 45) Plaintiff testified that, as a result of her back and leg pain, she could only stand or sit for ten minutes at a time. (Id.) Plaintiff also stated that she had been receiving household help through Services for Independent Living for about one year. (Tr. 51)

14

obesity.").

The Court is cognizant that "an ALJ is not required to discuss every piece of evidence submitted." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Nonetheless, the ALJ was required to provide "good reasons" for the weight given to Dr. Gessling's opinion and her failure to do so constitutes reversible error.

### C. *Borderline Intellectual Functioning*

Plaintiff also claims the ALJ erred in failing to find that Plaintiff had the severe impairment of borderline intellectual functioning. [ECF No. 22] Defendant counters that, even if the ALJ erred in not finding that Plaintiff had the severe impairment of borderline intellectual functioning, such error was harmless. [ECF No. 28]

At step two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). See also 404 C.F.R. § 404.1520(c). A severe impairment is a medically determinable impairment that "significantly limits [the claimant's] physical or mental ability to do basic work activities."[6] 20 C.F.R. § 404.1521(a). Although the plaintiff has "the burden of showing a severe impairment that significantly limited [his] physical or mental ability to perform basic work activities[,]…the burden of a claimant at this stage of the analysis is not great." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). See also Kirby, 500 F.3d at 708 ("Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard[.]") (internal citation omitted).

"Borderline Intellectual Functioning describes individuals with IQs between 71 and 84."

---

[6] Basic work activities include, among other things, physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling, as well as various mental and physical activities. 20 C.F.R. § 416.921(b).

Byes v. Astrue, 687 F.3d 913, 916 (8th Cir. 2012). "[B]orderline intellectual functioning should be considered a severe impairment" when the diagnosis is supported by substantial evidence in the record. Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) (citing Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997)); Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007) (remanding because the ALJ did not include borderline intellectual functioning as a severe impairment at step two of the sequential analysis).

Plaintiff presented school records demonstrating that, in 1979, when she was nine years old, her IQ was 74. (Tr. 336) At the hearing, Plaintiff testified that she received special education and she stopped attending school after ninth grade. (Tr. 41) Plaintiff also stated that she had to re-read letters several times to understand them and she struggled with math. (Tr. 41-42) On the other hand, Plaintiff stated in her testimony and function report that she was able to make change at the store, pay bills, drive, and play computer games. (Tr. 41-42, 288, 294) Plaintiff's work records showed that she worked ten years as a CNA and six years as an activity aide at a nursing home. (Tr. 262) Neither Plaintiff's testimony nor medical records stated that she was diagnosed with borderline intellectual functioning.

In her decision, the ALJ noted that the highest grade Plaintiff completed was ninth and she received special education in "reading, math, and language." (Tr. 20) Although the ALJ did not specifically discuss Plaintiff's IQ or borderline intellectual functioning, she determined that Plaintiff was moderately limited in her ability to concentrate, and maintain pace; and mildly limited in her ability to understand, remember, apply information, interact with others, and adapt. (Tr. 19) Additionally, the ALJ found that Plaintiff had the severe impairment of major depressive disorder. Accordingly, the ALJ included in the RFC limitations to "simple repetitive tasks" and "occasional contact with the public, co-workers, and supervisors." (Tr. 20)

As an initial matter, the Court notes the only evidence of a borderline intellectual functioning diagnoses in the record appears in a prior ALJ decision, dated December 2009, in which that ALJ found, based upon a consultative psychological examination of October 2007, that Plaintiff had the severe impairment of borderline intellectual functioning. (See Tr. 77) Significantly, the report from the 2007 psychological examination does not appear in the record and Plaintiff did not list borderline intellectual functioning as an impairment in her 2015 applications for Social Security benefits. Nor did she testify to any limitations in function resulting from this alleged impairment. The ALJ is under no "obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (citation omitted). See also Elmore v. Astrue, No. 4:11-CV-217-ERW-DDN, 2012 WL 1085487, at *10-11 (E.D. Mo. March 5, 2012).

Upon review, the Court finds the ALJ properly evaluated Plaintiff's mental impairments and there is no basis for reversal on this issue. Even if the ALJ erred in failing to identify borderline intellectual functioning as a severe impairment, such error was harmless because the ALJ accommodated any deficits in cognitive functioning by limiting her to simple, routine tasks.

### IV. *Conclusion*

For the reasons set forth above, the Court finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of April, 2019